# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Your Towne Builders, Inc., Cooper Custom Homes, Inc., Hess Home Builders, Inc., C&F, Inc., Horst & Son, Inc., Costello Builders, Inc., and Keystone Custom Homes, Inc., on behalf of themselves and all others similarly situated | : | CASES CONSOLIDATED |
| | : | |
| v. | : | |
| | : | |
| Manheim Township, Manheim Township General Municipal Authority, C. Matthew Brown, P.E., and ARRO Consulting, Inc. | : | |
| | : | |
| Appeal of: Manheim Township and Manheim Township General Municipal Authority | : | Nos. 331, 497, and 563 C.D. 2022 |
| | : | |
| Your Towne Builders, Inc., Cooper Custom Homes, Inc., Hess Home Builders, Inc., C&F, Inc., Horst & Son, Inc., Costello Builders, Inc., and Keystone Custom Homes, Inc., on behalf of themselves and all others similarly situated | : | |
| | : | |
| v. | : | |
| | : | |
| Manheim Township, Manheim Township General Municipal Authority, C. Matthew Brown, P.E., and ARRO Consulting, Inc. | : | |
| | : | |
| Appeal of: Your Towne Builders, Inc., Cooper Custom Homes, Inc., Hess Home Builders, Inc., C&F, Inc., Horst & Son, Inc., Costello Builders, Inc., and Keystone Custom Homes, Inc. | : | No. 911 C.D. 2022 Argued: September 11, 2023 |

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE ELLEN CEISLER, Judge

OPINION BY
JUDGE COVEY                                    FILED:  October 6, 2023

Your Towne Builders, Inc., Cooper Custom Homes, Inc., Hess Home Builders, Inc., C&F, Inc., Horst & Son, Inc., Costello Builders, Inc., and Keystone Custom Homes, Inc., on behalf of themselves and all others similarly situated, (collectively, Appellants) appeal from: the Lancaster County Common Pleas Court's (trial court) March 7, 2022 order entering judgment against Manheim Township (Township) and the Township's General Municipal Authority (Authority) (collectively, Appellees), jointly and severally in an amount to be determined (Judgment), and enjoining them from charging their current water tapping fee (tapping fee) (Pa. Cmwlth. No. 331 C.D. 2022); the trial court's May 9, 2022 order entering a supplemental judgment against Appellees (Supplemental Judgment) in the amount of $4,405,539.15 (Pa. Cmwlth. No. 497 C.D. 2022); and the trial court's May 18, 2022 order denying Appellants' post-trial motions (Pa. Cmwlth. No. 563 C.D. 2022).[1]  Appellees appeal from the trial court's January 10, 2018 order denying

---

[1]   "[T]he proper, procedural course to pursue in perfecting an appeal from [a] jury verdict is to reduce the verdict to judgment and take an appeal therefrom and not from an order denying post-trial motions." *Crosby v. Dep*[*'t*] *of Transp*[.], . . . 548 A.2d 281, 283 ([Pa. Super.] 1988).

Technically, an "[a]ppeal lies from the judgment entered and not the denial of post-trial motions," *id*., and a "verdict did [sic] not become final for purposes of appeal until properly reduced to and entered as a formal judgment under [Pennsylvania Rule of Civil Procedure 227.4,] Pa.R.C[iv.]P. [] 227.4." *Crystal Lake Camps v. Alford*, 923 A.2d 482, 488 (Pa. Super. 2007).

Appellees' motion for partial summary judgment; the trial court's March 7, 2022 Findings of Fact, Conclusions of Law, and Verdict; the trial court's March 7, 2022 order entering judgment on the Verdict; the trial court's May 9, 2022 order entering the Supplemental Judgment; the trial court's May 9, 2022 order staying enforcement of the March 7, 2022 verdict; the trial court's May 18, 2022 order denying Appellees' motion for post-trial relief; and the trial court's February 10, 2020 order granting C. Matthew Brown, P.E.'s (Brown), and ARRO Consulting, Inc.'s (ARRO) motion for nonsuit (Pa. Cmwlth. No. 911 C.D. 2022).[2]

Appellants present one issue for this Court's review: whether Appellants are entitled to a full refund of the tapping fees they paid to Appellees prior to March 28, 2016, given the trial court's determination that the Authority failed to adopt its tapping fees in accordance with the Municipality Authorities Act (MAA),[3] and that the Authority grossly miscalculated its tapping fees.[4]

The Authority presents six issues for this Court's review: (1) whether the trial court improperly relieved Appellants of their burden to prove damages by *sua sponte* reopening the record to call its own expert witness; (2) whether the trial court erred by excluding the value of the *Authority Constructed Facilities (1984-1998)* from the total cost basis of the water distribution system because it was

---

*Mitchell v. Milburn*, 199 A.3d 501, 504 n.3 (Pa. Cmwlth. 2018). Because the subject appeals are consolidated, and the trial court entered the final order on the docket on September 22, 2022, relative to the Supplemental Judgment, this Court will treat Appellants' appeal as an appeal from the trial court's May 9, 2022 Supplemental Judgment order entered on the docket on September 22, 2022.

[2] By November 1, 2022 Order, this Court granted Appellants' Application to Consolidate Appeals. In its brief, the Authority states that, although all of the appeals were filed by preceding counsel in an abundance of caution, it is only appealing from the trial court's May 9, 2022 Supplemental Judgment order entered on the docket on September 22, 2022. *See* Appellees' Br. at 1; *see also supra* note 1. The Township adopted and joined in the Authority's brief. *See* Township Br. at 1.

[3] 53 Pa.C.S. §§ 5601-5623.

[4] In their Statement of Questions Involved, Appellants separated this issue into two separate issues. *See* Appellants Br. at 6.

3

dedicated back to the Authority and the tapping fees recovered the cost; (3) whether the trial court erred by concluding that the Authority was collaterally estopped from litigating the Authority's ownership of portions of the water distribution system; and (4) whether the trial court erred by calculating a tapping fee with a design capacity component that arbitrarily included portions of the water distribution system that the Authority did not own.[5]

The Township presents four issues for this Court's review: (1) whether the Township was the Authority's agent for purposes of imposing tapping fees, and if so, whether the Township is liable to Appellants for MAA violations; (2) whether the trial court erred by reopening the record to establish damages after Appellants rested their case; and (3) whether Appellants are entitled to a refund of all tapping fees which they paid to the Authority.[6] As this matter has been fully briefed, and oral argument held, it is ready for disposition.

## Background[7]

For more than 40 years, Appellees have worked in conjunction with the City of Lancaster (City) to provide the Township's residents with access to the public water distribution system. Originally, the City solely constructed, owned, and operated the water distribution system that served the Township. In 1984, the Township desired to expand the water distribution system, but the City was not in a position to undertake construction of the necessary extensions. To accomplish this expansion, the City entered into a Municipal Connector's Agreement with the

---

[5] In the Authority's Statement of the Questions Involved, it separated the first and second issues into two separate issues, respectively, and the third and fourth issues into two separate issues, respectively. *See* Authority Br. at 13.

[6] In the Township's Questions Presented, it separated the first issue into two separate issues. *See* Township Br. at 5.

[7] The background is as summarized by the trial court. *See* Reproduced Record (R.R.) at 4529a-4535a (Trial Ct. Mar. 7, 2022 Op. at 9-15).

Township on December 18, 1984 (1984 Agreement).[8] The 1984 Agreement's stated purpose was to have a public water supply distribution system available to certain lands in the Township, which the Township would pay for, and the City would supply and sell the water after the lines were connected. Pursuant to the 1984 Agreement, the Township would construct water lines in accordance with the City's plans and specifications, and would pay all costs and expenses incurred in the construction of said water mains. The City would permit the Township to connect these lines to the City's existing water distribution system to allow the City to provide public water service to both present and future property owners located in the Township.

Pursuant to the 1984 Agreement, at its expense, the Township constructed water mains, laterals, hydrants, and pumping stations and, specifically, a large water main located under a section of Fruitville Pike, located in the Township, which connected to the existing water distribution system. To enable the Township to recover the costs incurred with this water distribution system expansion, the 1984 Agreement authorized the Township to impose a tapping fee on those who connected to the system. Upon the Township's and the City's certification that the new water distribution system was in service, the 1984 Agreement authorized the Township to lease the water distribution system to the City.

The terms of the Township's water distribution system lease with the City specified that the lease would terminate at the earlier of 20 years from when it was placed into service, or upon the Township's collection of sufficient tapping fees to recoup the costs associated with the water distribution system. The 1984 Agreement further provided that, upon the lease's termination, the Township would

---

[8] *See* R.R. at 662a-667a.

dedicate the water distribution system to the City and it would thereupon become a part of the water distribution system owned by the City. The Township water distribution system was placed into service sometime before April 18, 1988.

On September 17, 1985, the Authority adopted *A Resolution Establishing and Providing for the Imposition and Collection of Tapping Fees Upon and From Owners of Properties Connected or to be Connected to Water Lines Acquired or Constructed by the Authority* that imposed tapping fees on property owners connecting to the water distribution system. The original 1985 tapping fee was amended by resolution in 1985, 1987, 1990, and 1991. In 1993, the Authority authorized the imposition of a tapping fee in the amount of $4,011.00 per equivalent dwelling unit (EDU)[9] by way of *A Resolution Amending the Resolution Adopted by the Authority of the Township on September 17, 1985, as Previously Amended by Resolutions of November 9, 1985, August 21, 1987, February 16, 1990, and June 17, 1991* (1993 Resolution).

On June 28, 2004, the Township, the Authority, and the City executed the Extension of Municipal Connector's Agreement (2004 Extension Agreement),[10] which purported to extend the terms of the 1984 Agreement for 90 days from the 2004 Extension Agreement's execution date to September 26, 2004. The parties did not extend the 1984 Agreement before the 2004 Extension Agreement expired. Between 1993 and 2008, the Authority imposed a tapping fee in the amount of $4,011.00 per EDU on all property owners connecting to the water distribution system. In March 2008, Merchant Square L.P. (Merchant Square) purchased two lots in the Township for the purpose of developing a group of multi-family residences consisting of 92 units. To obtain building permits from the Township to

---

[9] "An . . . []EDU[] is a unit of measurement for volume of sewage flow, and typically one EDU will correspond to one residence." *J. Buchanan Assocs., LLC v. Univ. Area Joint Auth.*, 231 A.3d 1089, 1092 n.1 (Pa. Cmwlth. 2020).

[10] *See* R.R. at 679a-681a.

6

develop this real estate, the Township advised Merchant Square that it would be assessed tapping fees by the Authority.

During discussions with the City and the Township, Merchant Square uncovered conflicting information regarding the water distribution system's ownership and the Township's ability to impose tapping fees on Merchant Square. Thus, on March 18, 2008, Merchant Square's counsel wrote to the Township's solicitor in an effort to resolve the discrepancy informally. The letter identified the 1984 Agreement and suggested that its termination ended the Authority's ability to impose tapping fees. One month later, on April 18, 2008, the Township executed the Extension of Municipal Connector's Agreement (2008 Extension Agreement), which purported to confirm that the 1984 Agreement remained in effect beyond its initially stated duration term, thereby allowing the Authority to impose tapping fees on those wishing to connect to the water distribution system. In exchange for the City entering into the 2008 Extension Agreement, the Township agreed to undertake significant improvements to the City-operated water distribution system. Thereafter, the Authority proceeded to impose tapping fees on Merchant Square.

During this period, the City and Appellees entered into another Extension of Municipal Connector's Agreement (Second 2008 Extension Agreement),[11] which identified the specific improvements Appellees would make, dedicated the water distribution system back to the Authority at no cost, and extended the City's and Appellees' relationship for an additional 20 years. The plans were for a booster pumping station and related 24-inch main (Northwest Pumping Station Project) designed to improve the multi-township water distribution system for existing customers, many of whom were located outside of the Township. The project's estimated cost was $4,265,000.00.

_____

[11] *See* R.R. at 855a-857a.

7

In 2009, the Authority passed a motion increasing the tapping fee from $4,011.00 to $5,372.00 per EDU. Thereafter, Merchant Square paid the tapping fees to the Authority under protest for each apartsuit unit. On January 24, 2011, Merchant Square commenced legal action challenging Appellees' authority to impose water distribution system tapping fees on Merchant Square. This litigation resulted in two trial court opinions. In the first opinion, filed on November 19, 2014 (2014 Opinion),[12] the trial court addressed the ownership of the water distribution system in the Township, and the Authority's right to charge tapping fees. The trial court concluded that, upon the termination of the 20-year lease contained in the 1984 Agreement, the water distribution system was automatically offered for dedication to the City in 2004, and the City unconditionally accepted the dedication offer. In the second opinion, filed on January 15, 2016 (2016 Opinion),[13] the trial court held that the Authority failed to follow the MAA's statutorily mandated procedure for adopting the 2006 and 2009 tapping fees. In response to the 2016 Opinion, on February 5, 2016, the Authority adopted a new resolution authorizing tapping fees. Thereafter, the parties settled the Merchant Square litigation.

## Facts[14]

On August 22, 2014, during the pendency of the Merchant Square litigation, Appellants initiated a class action lawsuit by filing a complaint in the trial court against Appellees, Brown, and ARRO (collectively, Defendants). Defendants filed preliminary objections thereto, and Appellants filed a first amended complaint on October 2, 2014. Defendants again filed preliminary objections, and Appellants filed a second amended complaint on November 3, 2014 (Second Amended

---

[12] *See* R.R. at 942a-971a.

[13] *See* R.R. at 973a-1000a.

[14] The facts are as summarized by the trial court. *See* R.R. at 4521a-4529a (Trial Ct. Mar. 7, 2022 Op. at 1-9).

8

Complaint). Therein, Appellants alleged: (1) Appellees violated the MAA by imposing tapping fees during a period when the Authority did not own the water distribution system (Count I); (2) Appellees violated the MAA by miscalculating tapping fees during the class period (Count II); (3) Appellees violated article III, section 31 of the Pennsylvania Constitution[15] by assessing tapping fees for the general welfare, not for a specific benefit to Appellants, which thereby constitutes an impermissible tax (Count III); (4) Appellees violated the Fourteenth Amendment of the United States (U.S.) Constitution (Fourteenth Amendment)[16] by refusing to allow improvements to be made to Appellants' properties unless Appellants paid tapping fees to connect to a water distribution system which the Authority does not own (Count IV); (5) all Defendants conspired to violate the MAA (Count V); (6) Appellees conspired to violate the Pennsylvania Constitution (Count VI); and (7) all Defendants conspired to violate Appellants' right to substantive due process imposed by the Fourteenth Amendment (Count VII). These claims arise from Defendants' two alleged courses of action: (1) Appellees forfeited their right to impose tapping fees when they dedicated the water infrastructure improvements in the Township to the City and, even if they had a right to charge the fees, they

---

[15] Article III, section 31 of the Pennsylvania Constitution provides, in relevant part:

> The General Assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever.

PA. CONST. art. III, § 31.

[16] Section 1 of the Fourteenth Amendment to the U.S. Constitution states, in pertinent part:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the [U.S.]; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV, § 1.

miscalculated them; and (2) Appellees conspired with Brown and ARRO to miscalculate the tapping fees intentionally or recklessly in violation of state and federal law.

In the Second Amended Complaint, Appellants sought from Appellees: (1) a refund of the tapping fees paid; (2) an injunction against Appellees' imposition of tapping fees until they are recalculated; (3) an injunction compelling Appellees' recalculation of the water tapping fees; (4) an injunction against the Township from conditioning the issuance of building permits on the payment of tapping fees; and (5) an injunction against the Township from conditioning the issuance of building permits on the payment of tapping fees until the Authority recalculates the fees. Appellants also sought judgment against Brown and ARRO in the amount of the tapping fees Appellants paid. Defendants filed answers with new matter to the Second Amended Complaint on November 24, 2014. Appellants filed a reply to Defendants' new matter on December 10, 2014, after which the pleadings were closed.[17]

On February 3, 2017, Appellants filed a motion to amend the Second Amended Complaint (Motion to Amend). After the parties filed briefs, the trial court granted the Motion to Amend on March 21, 2017. On March 27, 2017, Appellants filed their third amended complaint. The pleadings were closed on May 10, 2017. Appellants filed a motion for partial summary judgment on August 15, 2017, which the trial court denied on January 10, 2018. On January 9, 2019, Appellees filed a motion for partial summary judgment (Motion). On May 7, 2019, the trial court:

---

[17] Thereafter, the trial court granted an unopposed motion to extend the time for Appellants to file a motion for class certification to January 23, 2015. Appellants timely filed their motion for class certification, the parties filed briefs, and the trial court heard oral argument on April 1, 2015. Following a class action certification hearing on July 15, 2015, and the subsequent filing of proposed findings of fact and conclusions of law, the trial court granted Appellants' motion for class certification on May 5, 2016.

granted the Motion as to Counts I (violation of MAA), III (violation of article III, section 31 of the Pennsylvania Constitution), and IV (violation of the Fourteenth Amendment); determined that Appellants' claims for tapping fees paid between 2004 and August 21, 2012, were barred by the statute of limitations; and denied without prejudice Defendants' request for clarification as to Appellants' potential damages arising from the miscalculation of the Authority's tapping fees. On January 11, 2019, Brown and ARRO filed a motion for summary judgment, which the trial court denied in part with respect to Count V (conspiracy to violate the MAA) as to claims arising on or after August 21, 2012, and granted in part as to any claims before that date as they were barred by the statute of limitations; and denied with respect to Count VII (conspiracy to violate Appellants' substantive due process rights imposed by the Fourteenth Amendment). On May 16, 2019, Brown and ARRO filed a request for clarification/reconsideration. On June 28, 2019, the trial court granted summary judgment in favor of all Defendants on Count VI (conspiracy to violate the Pennsylvania Constitution) and Count VII (conspiracy to violate Appellants' substantive due process rights imposed by the Fourteenth Amendment).

On February 10, 2020, the trial court held a non-jury trial. At the close of Appellants' case-in-chief, the trial court granted the Township's uncontested motion for compulsory nonsuit as to the conspiracy claims against the Township with respect to the Authority. The trial court also granted a motion for compulsory nonsuit as to the remaining conspiracy claim against Brown and ARRO and dismissed them from the action. The trial court ordered proposed findings of fact, conclusions of law, and briefs, which the remaining parties subsequently filed on March 3, 2020.

During an April 8, 2020 conference call, the trial court notified the parties that it had found Appellants' evidence at trial sufficient to establish liability, but, with respect to the damages, the trial court had an insufficient understanding of

11

the highly technical evidence to render a fair and impartial verdict with specific tapping fee calculations for three previous dates and one prospective date. Therefore, the trial court informed counsel of its intention to reopen the record and appoint an expert (at the parties' expense) to serve as a judicial tutor and to provide an independent report as to the relevant tapping fee calculations. Appellees submitted a letter to the trial court on May 1, 2020, objecting to the reopening of the record.

By May 5, 2020 order (May 5th Order), the trial court held that the Authority did not calculate the tapping fees it imposed on Appellants in accordance with the MAA at any point during the period relevant to this action, and reopened the record for the limited purpose of developing supplemental expert testimony by a witness to be designated by the trial court in accordance with Pennsylvania Rule of Evidence (Rule) 706, Pa.R.E. 706. Specifically, the trial court declared that the expert would provide an opinion as to the calculation of the tapping fees the Authority was/is permitted to charge as of each of the following dates: (1) January 16, 2009; (2) November 9, 2012; (3) February 5, 2016; and (4) the date of entry of the May 5th Order.

On June 1, 2020, on the joint recommendation of the parties, the trial court appointed Constance E. Heppenstall of Gannett Fleming Valuation and Rate Consultants, LLC (Expert) as its expert. Pursuant to the May 5th Order, Appellants submitted a letter to the Expert on June 19, 2020, containing the information they wished for her to consider. Similarly, on June 20, 2020, Appellees presented the Expert with a letter, which included information they deemed relevant for her consideration, and which further clarified their understanding of the limited scope of the Expert's authority to solely address the design capacity of the Authority's water distribution system. On June 22, 2020, Appellants requested clarification from the trial court regarding the Expert's role and the scope of her authority. In a

12

conference call on June 24, 2020, the trial court reiterated that the Expert was tasked with calculating the tapping fees in their entirety for each of the four dates specified in the May 5th Order.

Thereafter, at the trial court's direction, the parties prepared and submitted to the Expert a Joint Submission to the Court-Appointed Expert, which included 43 exhibits. On July 17, 2020, the Expert contacted the trial court and requested additional information. On July 23, 2020, the parties submitted the documents the Expert requested that were available to the parties at that time. The Expert subsequently requested clarification as to whether the Authority had a list of the water system's fixed assets and requested that the Authority provide the underlying documents for several of its projects to assist her in determining the total cost component of the Authority's tapping fee calculation. On August 5, 2020, Appellees' counsel emailed the trial court requesting its assistance in determining what, if any documents, should be provided to the Expert. Attached to the email were supporting documents that Appellees wished to submit to the Expert in response to her request. On August 5, 2020, Appellants' counsel responded to Appellees' email objecting to submission of the supporting documents. Counsel for the parties further conferred about what documents and information should be submitted to the Expert, but could not agree. Counsel submitted a Summary of Responses to the Expert's requests, which was submitted to the trial court with a request for an opportunity to provide argument regarding the parties' respective positions.

After conferring with the trial court on September 10, 2020, the parties attempted to resolve the dispute over the supporting documents and sought direction from the trial court by October 9, 2020 letter. The trial court conducted another teleconference on October 21, 2020, during which the trial court directed Appellees' counsel to analyze whether the values identified in the supporting documents were

13

accurately documented in the Authority's audited financial statements. In response, on December 2, 2020, Appellees provided a Memorandum Regarding Comparison of Financial Reports and System Values Used at Trial. Further emails were exchanged and, on December 23, 2020, at the trial court's direction, the parties submitted a jointly prepared letter addressing questions the trial court raised regarding the total cost basis component of the tapping fee calculations. On January 15, 2021, the trial court directed the Expert to prepare her report based on the documents the parties previously supplied, and informed her that no other documents would be provided.

On April 6, 2021, the Expert delivered her Tapping Fee Study (Expert Report) to the trial court. The trial court forwarded it to the parties' counsel on April 14, 2021. On June 21, 2021, the trial court conducted a hearing to allow the parties to question the Expert and her engineer, Scott Hughes, P.E., who assisted in preparing the Expert Report. The Expert Report was admitted into evidence during the hearing.

On March 7, 2022, the trial court entered Judgment against Appellees jointly and severally in an amount to be determined, enjoined them from imposing a tapping fee to connect to the Authority's water distribution system in excess of $202.09 per EDU, and directed the Authority to adopt an amended tapping fee based upon the trial court's findings within 90 days of the date of the trial court's order. *See* Reproduced Record (R.R.) at 4587a-4589a (March 7, 2022 Verdict). On May 9, 2022, the trial court entered its Supplemental Judgment against Appellees in the amount of $4,405,539.15. On May 18, 2022, the trial court denied Appellants' post-trial motions. On May 18, 2022, the trial court denied Appellees' motion for post-trial relief. Appellants appealed to this Court, and Appellees cross-appealed to this

14

Court.[18]  On September 22, 2022, the trial court's prothonotary entered judgment in the amount of $4,405,539.15 in Appellants' favor and against Appellees, jointly and severally, pursuant to the May 9, 2022 Supplemental Judgment.

## Discussion

### Appellants' Argument

Appellants argue that they are entitled to a full refund of the tapping fees they paid prior to March 28, 2016.  Specifically, Appellants contend that, given that the trial court properly determined that the Authority failed to adopt its tapping fees in accordance with the MAA, and that the Authority grossly miscalculated its tapping fees, Appellants are entitled to more than just a refund in the amount of the difference between what they paid pursuant to the 2009 and 2012 tapping fees and what they should have paid had those tapping fees been properly adopted and calculated.  The Authority rejoins[19] that its adoption of the tapping fees by *motion*,

---

[18]  This Court has explained:

> Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by [substantial] evidence and whether the trial court committed error in any application of the law.  The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury.  We consider the evidence in a light most favorable to the verdict winner.  We will reverse the trial court only if its findings of fact are not supported by [substantial] evidence in the record or if its findings are premised on an error of law.  However, [where] the issue . . . concerns a question of law, our scope of review is plenary.

> *Newman & Co. v. City of Phila.*, 249 A.3d 1240, 1244 n.5 (Pa. Cmwlth. 2021) (additional citations and quotation marks omitted).

*Pottstown Sch. Dist. v. Montgomery Cnty. Bd. of Assessment Appeals*, 289 A.3d 1142, 1145 n.3 (Pa. Cmwlth. 2023).

[19] The Township joins in the Authority's argument relative to this issue.  *See* Township Br. at 38.

15

rather than by *resolution* did not, as a matter of law, invalidate them.[20] The Authority further retorts that the MAA authorizes a common pleas court to return the *excess* tapping fees where a challenger proves that the municipal authority has imposed a tapping fee in contravention to the MAA.

Appellants cite *Delaney v. City of Wilkes-Barre*, 947 A.2d 854 (Pa. Cmwlth. 2008), and *Hidden Creek, L.P. v. Lower Salford Township Authority*, 129 A.3d 602 (Pa. Cmwlth. 2015), to support their position that because the trial court determined that the Authority failed to properly adopt the tapping fees, the tapping fees are void *ab initio*; thus, Appellants are entitled to a full refund of the tapping fees paid. At issue in *Delaney* were city ordinances passed without collective bargaining that allowed city firefighters to purchase time spent working in another capacity with the city for their firefighters' pension (buy-back). The *Delaney* Court held that the buy-back ordinances were void *ab initio* because

> the enactment of the [o]rdinances [] constituted a violation of [what is commonly referred to as the Policemen and Firemen Collective Bargaining Act or] Act 111 [(Act 111)],[21] which provides that the subject of pensions is a mandatory subject of bargaining. Further, the enactment of the [o]rdinances violated subsections (a) and (e) of Section 6(1) of the Pennsylvania Labor Relations Act (PLRA), Act of June 1, 1937, P.L. 1168, *as amended*, 43 P.S. § 211.6(1)(a) and (e), which make it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of rights guaranteed under the PLRA and to refuse to bargain collectively with representatives of the employees. Hence, the trial court was correct in finding that the [c]ity does not have the legal authority to recognize the [p]ension buy-backs or to make

---

[20] Although the Authority argued in its post-trial motion to the trial court that it correctly adopted the tapping fees, it did not specifically raise it as an issue in its brief to this Court in its Statement of the Questions Involved, or in its Argument.

[21] Act of June 24, 1968, P.L. 237, *as amended*, 43 P.S. §§ 217.1-217.10.

16

deductions from [the a]ppellants' pay checks to fund the buy-backs.

*Delaney*, 947 A.2d at 858 (citation and footnote omitted). Because the ordinances were determined to be void *ab initio* due to Act 111 and the PLRA violations, and neither of those statutes is involved in the instant case, *Delaney* is inapposite.

Section 5607(d)(24) of the MAA authorizes every authority "[t]o charge enumerated fees to property owners who desire to or are required to connect to the authority's sewer or water system." 53 Pa.C.S. § 5607(d)(24). Section 5607(d)(9) of the MAA provides, in relevant part:

> Any person questioning the reasonableness or uniformity of a rate fixed by an authority or the adequacy, safety and reasonableness of the authority's services, including extensions thereof, may bring suit against the authority in the court of common pleas of the county where the project is located or, if the project is located in more than one county, in the court of common pleas of the county where the principal office of the project is located. **The court of common pleas shall have exclusive jurisdiction to determine questions involving rates or service**.

53 Pa.C.S. § 5607(d)(9) (emphasis added). "Questions involving 'rates' concern the amount of money charged to provide a particular service." *Butler Twp. Area Water & Sewer Auth. v. Dep't of Env't Res.*, 664 A.2d 185, 187 (Pa. Cmwlth. 1995). The MAA "specifically authoriz[es] . . . the courts of common pleas to scrutinize ratemaking discretion in the same fashion as the [Pennsylvania Public Utility Commission]."[22] *Elizabeth Twp. v. Mun. Auth. of McKeesport*, 447 A.2d 245, 248 (Pa. 1982).

---

[22] The General Assembly's intent in vesting exclusive jurisdiction for rates and services with the court of common pleas was to preclude the Pennsylvania Public Utility Commission from hearing such challenges. *See Elizabeth Twp. v. Mun. Auth. of McKeesport*, 447 A.2d 245 (Pa. 1982).

17

Further, the *Hidden Creek* Court explained:

The General Assembly, through its careful crafting of the MAA's extraordinarily detailed provisions for determining the component parts, limited the amounts that municipal authorities could charge for tapping fees. *See* 53 Pa.C.S. § 5607(d)(24)(i)(C). The General Assembly also specifically permitted municipal authorities to be sued, and for the reasonableness of their rates to be challenged. Rates charged in excess of those permitted by statute are not reasonable rates.

Although [the d]eveloper's action is indeed a challenge to the [a]uthority's fees, it is also an action to recover damages. However, **those damages are simply the funds the [a]uthority collected**, **if any**, **exceeding the lawfully permitted rate**. . . . [The d]eveloper's cause of action, if successful, merely makes the [a]uthority adhere to the MAA by returning monies it obtained in violation thereof, along with accrued interest.

*Hidden Creek*, 129 A.3d at 612 (emphasis added).[23]

This Court has held:

In considering a question of statutory construction, we are guided by the Statutory Construction Act [of 1972 (SCA)]. The object of statutory construction is to ascertain and effectuate legislative intent. Section 1921(a) of the [SCA], 1 Pa.C.S. § 1921(a); *Whitmoyer v. Workers' Comp[.] Appeal [Bd.] (Mountain Country Meats)*, . . . 186 A.3d 947, 954 ([Pa.] 2018). In pursuing that end, we are mindful that a statute's plain language generally provides the best indication of legislative intent. *Whitmoyer*, 186 A.3d at 954; *Commonwealth v. McClintic*, . . . 909 A.2d 1241, 1243 ([Pa.] 2006). Thus, statutory construction begins with examination of the text itself. [*Se.*] [*Pa.*] *Transp[.] Auth[.] v. Holmes*, 835 A.2d 851, 856 (Pa. Cmwlth. 2003) . . . .

"[W]e are instructed to give the statute its obvious meaning whenever the language is clear and

---

[23] Importantly, in *Hidden Creek*, the developer alleged that the authority improperly adopted the tapping fees.

unambiguous." *Whitmoyer*, 186 A.3d at 954 (citing 1 Pa.C.S. § 1921(b)). "To that end, we will construe words and phrases according to their common and approved usage." *Id*. (citing [S]ection 1903 of the [SCA], 1 Pa.C.S. § 1903(a)). "Further, every statute shall be construed, if possible, to give effect to all [of] its provisions so that no provision is 'mere surplusage.'" *Id*. (citing 1 Pa.C.S. § 1921(a)); *Malt Beverages [Distribs.] Ass['n] v. [Pa.] Liquor Control [Bd.]*, 918 A.2d 171, 175-76 (Pa. Cmwlth. 2007), *aff'd*, . . . 974 A.2d 1144 ([Pa.] 2009). Moreover, we are to assume the General Assembly did not intend a result that is "absurd, impossible of execution or unreasonable." Section 1922(1) of the [SCA], 1 Pa.C.S. § 1922(1).

*J. Buchanan Assocs., LLC v. Univ. Area Joint Auth.*, 231 A.3d 1089, 1101 (Pa. Cmwlth. 2020).

Here, the General Assembly instructed that any person questioning the reasonableness or uniformity of an authority's rate may sue the authority in the court of common pleas. *See* 53 Pa.C.S. § 5607(d)(9). In furtherance of that instruction, the General Assembly vested the court of common pleas with exclusive jurisdiction to determine rate disputes. *See id.*; *see also Butler Twp. Area Water & Sewer Auth.* Thus, contrary to Appellants' assertion, there is nothing in the MAA requiring the trial court to refund the full amount of the tapping fees they paid prior to March 28, 2016. Rather, it was within the trial court's purview to direct Appellees to refund the excess tapping fees if the trial court determined that Appellees violated the MAA.

Moreover, the General Assembly unequivocally authorized municipal authorities to charge tapping fees. *See* 53 Pa.C.S. § 5607(d)(24). Thus, to refund the full amount of the tapping fees the Authority charged would negate that authorization. *See J. Buchanan Assocs., LLC*, 231 A.3d at 1101 (quotation marks omitted) ("[E]very statute shall be construed, if possible, to give effect to all [of] its provisions so that no provision is mere surplusage. . . . [W]e are to assume the General Assembly did not intend a result that is absurd[.]"). Accordingly,

19

Appellants are not entitled to a full refund of the tapping fees paid prior to March 28, 2016.

**The Authority's Arguments**

The Authority first argues that the trial court improperly relieved Appellants of their burden to prove damages by *sua sponte* reopening the record to call its own expert witness.[24] Specifically, the Authority contends that the trial court erred by relying on *West v. Hampton Township Sanitary Authority*, 661 A.2d 459 (Pa. Cmwlth. 1995), for the proposition that a finding of liability automatically results in damages. Further, the Authority asserts that the trial court erred by relying on *In Re: Appeal of the Board of Auditors of McKean Township/2017 Meeting*, 201 A.3d 252 (Pa. Cmwlth. 2018), to support its decision to reopen the record and call its own expert witness. Appellants rejoin that the Authority took a contrary position before the trial court and conceded that the trial court had the discretion to reopen the record and appoint an expert witness. Appellants further retort that the Authority mischaracterizes the trial court's reliance on *West* and *McKean Township*.

Relative to the trial court's reliance on *West*, the trial court stated:

> **Th[e trial c]ourt did not relieve [Appellants] of their burden of proof in this case**, which is "to prove that the Authority abused its discretion by establishing a rate system which was either unreasonable or lacking in uniformity" pursuant to the specific mandates of the MAA. *West* . . . , 661 A.2d [at] 463 . . . . (citation omitted). By [trial court o]rder entered on May 5, 2020, th[e trial c]ourt found [Appellants'] evidence presented during its case-in-chief sufficient to prove liability. *See* [o]rder of May 5, 2020, at 111 (holding that the Authority "did not calculate the tapping fees it imposed on [Appellants] in accordance with the [MAA] at any point

---

[24] The Township also argues that the trial court erred by reopening the record after Appellants rested their case for the purpose of calculating damages.

during the period relevant to this action"). Inherent in th[e trial c]ourt's finding that [Appellants] carried their burden of proof on liability is a finding that damages had been sustained. What remained was the methodology to be utilized in the calculation of the damages which warranted the assistance of an unbiased expert. Judgment was properly entered in this case against [Appellees].

R.R. at 4711a-4712a (emphasis added). Thus, the trial court relied on *West* to establish Appellants' burden of proof, not to hold that a finding of liability automatically results in damages. Moreover, in *West*, contrary to the instant case, there was no request for monetary relief because the challenger never paid any tapping fees.

Concerning the trial court's reliance on *McKean Township*, the trial court stated:

> Indeed, **under certain circumstances**, **our appellate courts have held it necessary and imperative for a court to appoint an expert**. *See . . . McKean Township*, 201 A.3d [at] 263-64 . . . . Such was the situation in the instant case, where counsel[s]' views of the evidence, the issues, and the law were so very divergent that th[e trial c]ourt determined that it could not competently perform its responsibilities as a fact[-]finder in calculating damages unless it was assisted by a neutral and competent expert. Th[e trial c]ourt was not sufficiently convinced by either [Appellants'] qualified expert, Gary Shambaugh [(Shambaugh)], or [Appellees'] conflicted lay witness and co[-]defendant, [] Brown, as to the specific damages resulting from the established liability, **particularly considering the** [**trial c**]**ourt's responsibility to specify a future water**[]**tapping fee** for the purpose of fashioning injunctive relief. Indeed, Defendants conceded their miscalculation of certain tapping fees, thus demonstrating an inability to establish the fees in accordance with a very technical and exacting statute despite their expertise, which far exceeds the [trial c]ourt's knowledge and experience. The potential for a miscarriage of justice warranted the appointment of an independent expert at the conclusion of the trial [court] testimony in this case and the submission of an expert report.

21

R.R. at 4713a (emphasis added). Accordingly, the trial court merely cited *McKean Township* as an example of a case in which a fact-finder appointed an expert witness. Thereafter, the trial court proceeded to explain why it needed to do so in the instant case.

With respect to the Authority's concession that the trial court had the discretion to reopen the record and appoint an expert witness, in a May 1, 2020 letter to the trial court, the Authority's counsel stated:

> [Appellees] acknowledge that **in a non-jury trial like this one**, **trial courts "have the inherent discretion to reopen the record on their own and to grant the parties leave to supplement it with evidence regarding a particular issue**, **as long as neither party is prejudiced**." *Commonwealth v. Safka*, 141 A.3d 1239, 1249-[]50 (Pa. 2016). **And that trial courts may appoint their own expert witnesses and call them to testify**. *Id*. at 1249 (citing Pa.R.E. 706).
>
> While [**Appellees**] **recognize the [trial c]ourt's discretion**, they do not believe reopening the record and designating a court-appointed expert is appropriate.

R.R. at 2213a (emphasis added). Indeed, in *Safka*, the Pennsylvania Supreme Court explained:

> [W]e are mindful that in a bench trial, the trial court is acting in two distinct capacities: first, as the gate[-]keeper, ruling on the admissibility of evidence; and second, as the fact-finder, affording weight to the admissible evidence. Because of the general discretion afforded to the trial court under the rules of evidence, and the trial court's dual role in a non-jury trial, we hold that **trial courts have the inherent discretion to reopen the record on their own and to grant the parties leave to supplement it with evidence regarding a particular issue**, **as long as neither party is prejudiced**. The trial court's discretion to reopen the record is not cabined by a party's request to do so. Rather, **if the trial court believes that preventing a miscarriage of justice requires reopening the record**, **it has the discretion to do so**.

22

*Safka*, 141 A.3d at 1249-50 (emphasis added; footnotes omitted).

The *Safka* Court also expounded:

Pennsylvania's evidentiary rules specify that trial courts make preliminary and, in due course, final decisions about the admissibility of evidence. Pa.R.E. 104(a) ("The court must decide any preliminary question about whether . . . evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege."). *See also Commonwealth v. Alicia*, . . . 92 A.3d 753, 760 ([Pa.] 2014) ("The admissibility of evidence is within the sound discretion of the trial court. . . ."). By providing that the trial court is not bound by evidentiary rules in determining the admissibility of evidence, except those regarding privilege, [Rule] 104(a) recognizes that the judge "should be empowered to hear any relevant evidence to resolve questions of admissibility." Pa.R.E. 104 cmt.

**Rules 614(a) and 706 further empower the trial court to call a witness on its own**. Pa.R.E. 614(a) ("Consistent with its function as an impartial arbiter, the court, with notice to the parties, may call a witness on its own or at a party's request. Each party is entitled to cross-examine the witness."); Pa.R.E. 706 (permitting the trial court to appoint an expert witness and call that witness to testify). *See also* [Federal Rule of Evidence] 614 cmt. (providing, in the federal counterpart to [] Rule 614, that "**the authority of the judge to call witnesses is well established**. . . . And the judge is not imprisoned within the case as made by the parties.").

*Safka*, 141 A.3d at 1249 (emphasis added).

Relative to discretion, the Pennsylvania Supreme Court has explained:

[T]he "term 'discretion' imports the exercise of judgment, wisdom[,] and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the trial judge." *Commonwealth v. Gill*, . . . 206 A.3d 459, 466 ([Pa.] 2019) (internal brackets, quotation marks[,] and citation omitted). An appellate court should not disturb a trial court's discretionary ruling absent an abuse of discretion. *See id.* An abuse of discretion is more than

23

merely an error of judgment but is rather the result of an error of law or is manifestly unreasonable or the result of partiality, prejudice, bias, or ill-will. *See Commonwealth v. DiStefano*, . . . 265 A.3d 290, 297 ([Pa.] 2021) (citing *Gill*, 206 A.3d at 466-67).

*Commonwealth v. Perrin*, 291 A.3d 337, 342-43 (Pa. 2023). Based on the trial court's reasoning and the above-cited *stare decisis*, this Court cannot conclude that the trial court abused its discretion by reopening the record and appointing an expert witness to assist in determining damages.

The Authority next argues that the trial court erred by excluding portions of the *Authority Constructed Facilities (1984-1998)* from the total cost basis of the water distribution system. Specifically, the Authority contends that the trial court erred by treating the City's *dedication* of the *Authority Constructed Facilities (1984-1998)* to the Authority as a *contribution* under the MAA and excluding it as a fee. The Authority references Black's Law Dictionary to support its position. The Authority asserts that because the Second 2008 Extension Agreement, which dedicated the water distribution system back to the Authority at no cost and extended the City's and Appellees' relationship for an additional 20 years, was conditioned upon Appellees constructing the Northwest Pumping Station Project at a cost of $4,265,000.00, it was not *contributed* to the Authority. The Authority cites the Expert's testimony to support its position. The Authority further claims that Section 5607 of the MAA does not prohibit municipal authorities from including the value of facilities in its system's total cost basis once the facilities' cost has been recovered, nor does it indicate that an authority's equity in facilities is dispositive of whether it may be included in a system's total cost basis.

Appellants rejoin that the Authority's use of Black's Law Dictionary's definitions for *dedication* and *contribution* is misplaced, as they are technical terms the General Assembly used within the MAA. Further, Appellants retort that the trial

24

court's crediting of Shambaugh's and Brown's testimony over that of the Expert is within the trial court's discretion and is supported by the record evidence. Finally, Appellants maintain that the trial court's reference to the Authority's recovery of its equity in the water distribution system through tapping fees is made in conjunction with its analysis of whether the infrastructure was *contributed*.

> Section 5607(d)(24)(i)(C) of the MAA provides, in relevant part:
>
> Tapping fee. A tapping fee shall not exceed an amount based upon some or all of the following parts which shall be separately set forth in the resolution adopted by the authority to establish these fees. . . .
>
> . . . .
>
> (II) Distribution or collection part. The distribution or collection part may not exceed an amount based upon the cost of distribution or collection facilities required to provide service, such as mains, hydrants and pumping stations. Facilities may only include those that provide existing service. **The cost of distribution or collections facilities**, **excluding facilities contributed to the authority by any person**, **government or agency**, **or portions of facilities paid for with contributions or grants other than tapping fees**, shall be based upon historical cost trended to current cost using published cost indexes or upon the historical cost plus interest and other financing fees paid on debt financing such facilities.

53 Pa.C.S. § 5607(d)(24)(i)(C) (emphasis added).

The instant issue requires this Court to interpret the term *contributed* as it is used in Section 5607(d)(24)(i)(C)(II) of the MAA.

> "Issues of statutory interpretation present this Court with questions of law; accordingly, our standard of review is de novo, and our scope of review is plenary." *Pa. Pub. Util. Comm'n v. Andrew Seder/The Times Leader*, . . . 139 A.3d 165, 172 ([Pa.] 2016). The task of interpreting a statute is guided by the [SCA]. . . .

25

> Pursuant to [the SCA], "[t]he object of all statutory interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). When the words of a statute are clear and free from ambiguity, the letter of the statute is not to be disregarded under the pretext of pursuing its spirit. *Id.* § 1921(b). When, however, the words of a statute are not explicit, **a court may discern the General Assembly's intent by examining considerations outside of the words of the statute**. *Id.* § 1921(c). . . .
>
> The [SCA] also instructs that, in ascertaining the intention of the General Assembly in enacting a statute, several presumptions may be used. *Id.* § 1922. Among those presumptions is that "**the General Assembly intends the entire statute to be effective and certain**." *Id.* § 1922(2). We also may presume that **the General Assembly does not intend absurd or unreasonable results**. *Id.* § 1922(1). As this Court wisely stated over [60] years ago, to avoid such results, we "**must read** [**statutes**] **in the light of reason and common sense**." *Ayers v. Morgan*, . . . 154 A.2d 788, 789 ([Pa.] 1959).

*Vellon v. Dep't of Transp., Bureau of Driver Licensing*, 292 A.3d 882, 890 (Pa. 2023) (emphasis added).

Here, the trial court equated the term *dedicated* with the term *contributed*, and found as a fact: "The Authority's inclusion of the []*Authority Constructed Facilities (1984-1998)*[] in the total cost basis component of the 2006, 2009, 2012 and 2016 [c]alculations violates the MAA, **which requires the Authority to exclude dedicated facilities**." R.R. at 4582a (finding of fact (FOF) 10) (italic and bold emphasis added). The trial court first correctly stated: "The MAA allows the Authority to include only the cost of facilities that have been constructed, **have not been contributed**, and are currently in use in the total cost basis component of a distribution-part fee calculation." R.R. at 4543a (emphasis added). However, thereafter, the trial court summarized: "In sum, the total cost of the facilities is derived by adding the trended original or historical cost of the

26

distribution-related facilities, **excluding contributed and dedicated facilities**, and subtracting outstanding debt associated with the system from that cost." R.R. at 4545a-4546a (emphasis added).

Having determined that the terms *contributed* and *dedicated* as used in the MAA were the same, based on the Second 2008 Extension Agreement, which identified the specific improvements that Appellees would make and **dedicated the water distribution system back to the Authority at no cost**, *see* R.R. at 4534a, the trial court ruled that including the *Authority Constructed Facilities (1984-1998)* in the total cost basis component of the 2006, 2009, 2012, and 2016 calculations violated the MAA. However, such interpretation ignores the General Assembly's and the parties' intent in entering into the Second 2008 Extension Agreement by reading both the statute and the Second 2008 Extension Agreement in a vacuum.

First, Section 5607(d)(24)(i)(C)(II) of the MAA does not end after "[t]he cost of distribution or collections facilities, excluding facilities contributed to the authority by any person, government or agency," but, rather, continues "or portions of facilities paid for with contributions or grants other than tapping fees[.]" 53 Pa.C.S. § 5607(d)(24)(i)(C)(II). Thus, the General Assembly expressed its intent to deduct the cost of facilities paid for with money "other than tapping fees." *Id*. Second, the 1984 Agreement, the 2004 Extension Agreement, and the 2008 Extension Agreement, in addition to the Second 2008 Extension Agreement, reflect that the Township originally agreed to **construct and pay for a public water distribution system** and that the City would supply and sell the water after the lines were connected. The 1984 Agreement leased the water distribution system to the City. Importantly, the 1984 Agreement authorized the Township to impose a tapping

27

fee on whoever connected to the system to recover the costs incurred with the expansion of the water distribution system.[25] *See* R.R. at 4530a.

However, the 1984 Agreement specified:

> If the total cost [of the water distribution system] has been recovered prior to 20 years from the date when the line was placed in service, the lease shall terminate at the recovery of such cost. If the said total cost has not been recovered prior to 20 years from the date when the line was placed in service, **it shall terminate** in all events, at the end of said 20[-]year period **and the right of the [Township] to recover any more costs shall cease**.

R.R. at 4531a (emphasis added) (quoting *Merchant Square* Complaint, Ex. A ¶ 9). The 2004 Extension Agreement extended the 1984 Agreement, and the Authority continued to impose tapping fees.[26] The 2008 Extension Agreement "purported to 'confirm' that the '[1984 Agreement] remained in effect beyond [its] initially stated duration [term],' thereby allowing the Authority to impose a water tapping fee on those wishing to connect to the water distribution system." R.R. at 4533a-4534a (quoting *Merchant Square* Complaint, Ex. D). The Second 2008 Extension Agreement "identified the specific improvements that [Appellees] would make and dedicated the water distribution system back to the Authority at no cost and extended their relationship for an additional 20 years." R.R. at 4534a (quoting 2014 Opinion at 22).

The various Agreements reveal that the Township paid for the *Authority Constructed Facilities (1984-1998)* with nothing "other than tapping fees" from their inception. Further, the 1984 Agreement that the Township would pay for

---

[25] This Court acknowledges that the trial court determined that the Township did not own the water distribution system for the purpose of imposing tapping fees once it dedicated it to the City.

[26] Although the Township entered into the Agreements, the Authority imposed the tapping fees.

28

construction in exchange for the right to charge tapping fees has continued through and including the Second 2008 Extension Agreement.[27] If the dedication of the *Authority Constructed Facilities (1984-1998)* would terminate the Authority's right to impose tapping fees, the extension of the 1984 Agreement for another 20 years would be meaningless. Although the dedication was at **no cost**, it is clear that Appellees were obligated to pay for the Northwest Pumping Station Project at the estimated cost of $4,265,000.00. Thus, under these circumstances, the dedication is not equivalent to a contribution in that Appellees paid for the construction of the *Authority Constructed Facilities (1984-1998)*, and the *Authority Constructed Facilities (1984-1998)* were not "paid for with [money] or grants other than tapping fees." 53 Pa.C.S. § 5607(d)(24)(i)(C)(II). Accordingly, the trial court erred by excluding the value of the *Authority Constructed Facilities (1984-1998)* from the total cost basis of the water distribution system.[28]

The Authority next argues that the trial court erred by concluding that the Authority was collaterally estopped from litigating the Authority's ownership of portions of the water distribution system. Specifically, the Authority contends that, because the 2016 *Merchant Square* case settled before the disputed rulings were final and appealable, collateral estoppel does not apply. Appellants rejoin that it is the 2014 Opinion, which collaterally estops the Authority from relitigating ownership of portions of the water distribution system.

---

[27] This Court again acknowledges that the trial court determined the Township did not own the water distribution system once it dedicated it to the City for the purpose of imposing tapping fees.

[28] To the extent the trial court held that the *Authority Constructed Facilities (1984-1998)* should not be included in the cost basis because the cost was recovered by tapping fees, the MAA includes no such requirement. Rather, Section 5607(d)(24)(i)(C)(II) of the MAA requires: "Facilities may only include those that **provide existing service**." 53 Pa.C.S. § 5607(d)(24)(i)(C)(II) (emphasis added). Accordingly, this Court rejects said argument.

Collateral estoppel "forecloses re-litigation in a later action, of an issue of fact or law which was actually litigated and which was necessary to the original judgment." *City of Pittsburgh v. Zoning Bd. of Adjustment of City of Pittsburgh*, . . . 559 A.2d 896, 901 ([Pa.] 1989) (citation omitted).  As a result, collateral estoppel, also referred to as issue preclusion, "relieves parties of the cost and vexation of multiple lawsuits, conserves judicial resources, and, by preventing inconsistent decisions, encourages reliance on adjudication."  *Off*[.] *of Disciplinary Counsel v. Kiesewetter*, . . . 889 A.2d 47, 51 ([Pa.] 2005) (citation omitted).  Collateral estoppel applies when

> (1) the issue decided in the prior case is identical to the one presented in the later action; (2) there was a final adjudication on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.

> *Id*. at 50-51 (citation omitted).

*Sheils as Tr. for Smith & Morris Holdings, LLC v. Bartles*, 295 A.3d 302, 308-09 (Pa. Cmwlth. 2023).

Here, while in the 2014 Opinion the trial court held, "as of December 4, 2008, the [w]ater [d]istribution [s]ystem was **dedicated** back to [Appellees] and [Appellees] **owned** the entire 'public water supply system' in the Township[,]" it made no mention of whether the public water supply system was **contributed** to the Authority for purposes of the MAA.  R.R. at 965a (emphasis added).  Accordingly, because ownership is not the issue before this Court, whether collateral estoppel applies to the ownership issue does not impact this appeal.

Finally, the Authority argues that the trial court erred by calculating a tapping fee with a design capacity component that arbitrarily included portions of

the water distribution system that the Authority did not own. Specifically, the Authority asserts:

> A tapping fee is calculated by taking the cost basis of an authority's fixed assets (in dollars), dividing it by the design capacity of the authority's system (in gallons per day) and then multiplying the quotient by an . . . EDU, in gallons per day. ([*See*] R.[R. at] 4546a.) Based on this equation, the larger the design capacity in gallons is - the denominator - the lower the tapping fee will be, and vice-versa. Based on this formula, an authority has in [sic] interest in having its design capacity calculated such that it is only associated with facilities it owns and from which it is permitted to collect tapping fees. Any extraneous facilities added to the design capacity will artificially deflate an authority's potential tapping fee.
>
> Here, instead of identifying Authority-owned facilities for purposes of determining the Authority's design capacity, the trial court's appointed expert[] counted all facilities located within [the] Township, irrespective of whether they were used by Authority customers or City customers. Determining the Authority's design capacity based on municipal boundaries is, of course, an arbitrary practice[.]

Authority Br. at 47.

> Appellants rejoin:
>
> The [MAA] does not limit the determination of design capacity to the portion of a system owned by the subject authority or require that design capacity be calculated for systems located within the [] municipal boundary. The [MAA's] broad definition of system design capacity is particularly important here given the nature of the Authority's system.
>
> The Authority's water [distribution] system consists only of distribution facilities. [*See*] R.[R. at] 4884a. The City produces water to serve customers located in the Township, West Earl Township, Penn Township[,] and customers served by the Northwestern Lancaster County Authority. [*See*] R.[R. at] 3465a-3466a. Water treated by the City is conveyed to these customers through an

> interconnected system that consists of infrastructure owned by the City, the Authority, West Earl Township, Penn Township[,] and the Northwestern Lancaster County Authority. [*See i*]*d*. Specifically, the Authority-owned portions of the interconnected system convey water from the City to the surrounding townships. [*See i*]*d*. The relevant "system" for the purposes of calculating design capacity is the inter-municipal/inter-authority system serving the Township and the surrounding areas. [*See*] R.[R. at] 4441a-4442a.

Appellants Second Br. at 57-58 (footnote omitted).

Section 5607(d)(24)(i)(C)(VII) of the MAA defines "design capacity," in relevant part, as: "For residential customers, the permitted or rated capacity of facilities expressed in million gallons per day. . . . The units of measurement used to express design capacity shall be the same units of measurement used to express the system design capacity." 53 Pa.C.S. § 5607(d)(24)(i)(C)(VII). "**System design capacity**" is defined as: "The design capacity of **the system** for which the tapping fee is being calculated which represents the **total design capacity of the treatment facility or water sources**." *Id*. (bold text emphasis added). "'Design capacity' refers to the wastewater requirements of a customer. 'System design capacity' refers to the maximum wastewater capacity of the municipal authority's sewer facility." *J. Buchanan Assocs., LLC*, 231 A.3d at 1093 n.5.

Here, the trial court relied upon the Expert's testimony in concluding that the *design capacity* component included portions of the water distribution system that the Authority did not own. The trial court found as a fact:

> As [the Expert] explained, it would be inappropriate to calculate the Authority's design capacity based only on flows to customers connected to Authority-owned lines:
>
> > [**T**]**he whole system is interconnected**. Water flows through. And we're trying to figure out what capacity of this system is. And because it's interconnected it wouldn't just be the lines of the City.

> These are large lines that the Authority built that would have much more water going through them. It wouldn't just be servicing the customers on those lines. It would serve customers beyond what they've built.
>
> [Notes of Testimony], June 21, 2021, Hearing at 18. *See also id.* at 38-39, 42.

R.R. at 4573a-4574a (FOF 134) (emphasis added). Based thereon, the trial court found: "The Authority's water distribution system is fully integrated with the City's lines and other lines owned by surrounding [t]ownships." R.R. at 4574a (FOF 135).

"[I]t is not the province of this Court to make new or different findings of fact." *Reinhart v. Dep't of Transp., Bureau of Driver Licensing*, 954 A.2d 761, 765 (Pa. Cmwlth. 2008). Further,

> [d]eterminations as to the credibility of witnesses and the weight assigned to the evidence are solely within the province of the trial court as fact-finder. As fact-finder, the trial court may accept or reject the testimony of any witness in whole or in part. Conflicts in the evidence are for the trial court to resolve and are improper questions for appellate review.

*Id.* (citations omitted). Here, the trial court accepted the Expert's testimony regarding the design capacity, which was within its province. Accordingly, the trial court did not err in calculating a tapping fee with a design capacity component that included portions of the water distribution system that the Authority did not own.

**The Township's Argument**

The Township argues that it was not the Authority's agent for purposes of imposing tapping fees.[29] Specifically, the Township contends that the evidence

---

[29] The Township's additional arguments were addressed above.

33

that the trial court relied upon, standing alone, does not prove an agency relationship for purposes of imposing tapping fees. Appellants rejoin:

> [T]he totality of that evidence - plus the vast volume of inculpatory evidence of which the [t]rial [c]ourt was well aware, but did not cite in this case - paints a vastly different and most compelling picture of an institution that was deeply involved in and highly motivated to effect the Authority's violations for the Authority's benefit.

Township Br. at 24.

The Pennsylvania Supreme Court has explained:

> The law is clear in Pennsylvania that the three basic elements of agency are: "'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'" *Scott v. Purcell*, . . . 415 A.2d 56, 60 ([Pa.] 1980), quoting Restatement (Second) of Agency § 1, Comment b ([Am. Law Inst.] 1958); *see also Reid v. Ruffin*, . . . 469 A.2d 1030, 1033 ([Pa.] 1983). "**[A]gency results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary**." *Smalich v. Westfall*, . . . 269 A.2d 476, 480 ([Pa.] 1971). The burden of establishing an agency relationship rests with the party asserting the relationship. *Scott*, . . . 415 A.2d at 61 n.8. "**An agency relationship is a fiduciary one**, **and the agent is subject to a duty of loyalty to act only for the principal's benefit**." *Sutliff v. Sutliff*, . . . 528 A.2d 1318, 1323 ([Pa.] 1987), citing Restatement (Second) of Agency § 387 ([Am. Law Inst.] 1958). Thus, in all matters affecting the subject of the agency, the agent must act with the utmost good faith in furthering and advancing the principal's interests, including a duty to disclose to the principal all relevant information. *See Sylvester v. Beck*, . . . 178 A.2d 755, 757 ([Pa.] 1962).

*Basile v. H&R Block, Inc.*, 761 A.2d 1115, 1120 (Pa. 2008) (emphasis added).

34

The *Basile* Court clarified:

> The special relationship arising from an agency agreement, with its concomitant heightened duty, cannot arise from any and all actions, no matter how trivial, arguably undertaken on another's behalf. Rather, **the action must be a matter of consequence or trust**, **such as the ability to actually bind the principal or alter the principal's legal relations**. Indeed, implicit in the long[ ]standing Pennsylvania requirement that the principal manifest an intention that the agent act on the principal's behalf is the notion **that the agent has authority to alter the principal's relationships with third parties**, **such as binding the principal to a contract**. Notably, the Restatement, which [the Pennsylvania Supreme Court] ha[s] cited with approval in this area in the past, specifically recognizes as much. *See* Restatement (Second) of Agency § 12 [(Am. Law Inst. 1958)] ("An agent or apparent agent holds a power to alter the legal relations between the principal and third persons and between the principal and himself.").

*Basile*, 761 A.2d at 1121 (italics omitted; emphasis added).

It is undisputed that the parties in the instant matter stipulated that "[t]he Township acts as an agent of the Authority with respect to collection of water tapping fees." R.R. at 4706a; Township Br. at 11. The Township claims that agency does not include imposition of those fees. However, the record evidence belies the Township's claim.

> The trial court declared:

> [T]he Authority acts through its agent, [the] Township, in furtherance of its legislative power to collect enumerated fees from property owners who desire or are required to connect to the Authority's water distribution system. *See* 53 Pa.C.S.[] § 5607(d)(24).

> The Township, pursuant to the well-settled law of agency, is bound by the statutory duties imposed on its principal, the Authority. *See* Restatement (Third) of Agency, § 1.01 [(Am. Law Inst. 2006)]; § 7.01, Comment c. When an

35

agent undertakes to act for its principal, the agent must comply with the statutory requirements that are imposed upon its principal. Because the Authority is bound by the MAA, its agents, employees, and representatives are also covered by the legislative mandate. *See Roberts v. Est*[.] *of Barbagallo*, . . . 531 A.2d 1125, 1130 ([Pa. Super.] 1987) (citing Restatement (Second) of Agency[,] § 348 [(1958)]) (noting an agent may be liable for the acts of a disclosed principal if he takes some active part in violating some duty the principal owes to a third person).

R.R. at 4706a-4707a (footnotes omitted). The trial court continued to set forth the Township's active part in violating the MAA including, *inter alia*, the Township's Commissioner making the oral motion at the Authority's meeting to adopt the 2009 water tapping fee, and the Township's finance director providing the incorrect interest figure used to incorrectly calculate the 2009 tapping fee. The trial court concluded: "The Township's continued involvement with the process of setting and collecting illegal tapping fees more than meets the standard necessary to impose liability on an agent." R.R. at 4710a. This Court agrees with Appellants that the totality of the circumstances, including the Township's involvement in the 1984 Agreement, the 2004 Extension Agreement, the 2008 Extension Agreement, and the Second 2008 Extension Agreement, supports the trial court's conclusion that the Township was the Authority's agent for purposes of imposing tapping fees.

**Conclusion**

For all of the above reasons, the portion of the trial court's May 9, 2022 order entering Judgment in favor of Appellants and against Appellees jointly and severally, and enjoining them from charging their current water tapping fee is affirmed. The portion of the trial court's May 9, 2022 order entering Supplemental Judgment in the amount of $4,405,539.15 is vacated, and the matter is remanded to the trial court to recalculate the amount of the refund after including portions of the

36

*Authority Constructed Facilities (1984-1998)* in the total cost basis of the water distribution system.


_____
ANNE E. COVEY, Judge

Your Towne Builders, Inc., Cooper
Custom Homes, Inc., Hess Home
Builders, Inc., C&F, Inc., Horst & Son,
Inc., Costello Builders, Inc., and
Keystone Custom Homes, Inc., on
behalf of themselves and all others
similarly situated

            v.

Manheim Township, Manheim
Township General Municipal
Authority, C. Matthew Brown, P.E.,
and ARRO Consulting, Inc.

Appeal of: Manheim Township and
Manheim Township General
Municipal Authority

:   CASES CONSOLIDATED
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:   Nos. 331, 497, and 563 C.D. 2022
:
:

Your Towne Builders, Inc., Cooper
Custom Homes, Inc., Hess Home
Builders, Inc., C&F, Inc., Horst & Son,
Inc., Costello Builders, Inc., and
Keystone Custom Homes, Inc., on
behalf of themselves and all others
similarly situated

            v.

Manheim Township, Manheim
Township General Municipal
Authority, C. Matthew Brown, P.E.,
and ARRO Consulting, Inc.

Appeal of: Your Towne Builders, Inc.,
Cooper Custom Homes, Inc., Hess

Home Builders, Inc., C&F, Inc.,           :
Horst & Son, Inc., Costello Builders,     :    No. 911 C.D. 2022
Inc., and Keystone Custom Homes, Inc.  :

## O R D E R

AND NOW, this 6th day of October, 2023, the portion of the Lancaster County Common Pleas Court's (trial court) May 9, 2022 order entering Judgment in favor of Your Towne Builders, Inc., Cooper Custom Homes, Inc., Hess Home Builders, Inc., C&F, Inc., Horst & Son, Inc., Costello Builders, Inc., and Keystone Custom Homes, Inc., on behalf of themselves and all others similarly situated (collectively, Appellants), and against Manheim Township (Township) and the Township's General Municipal Authority (collectively, Appellees) jointly and severally, and enjoining Appellees from charging their current water tapping fee is AFFIRMED.  The portion of the trial court's May 9, 2022 order entering Judgment in the amount of $4,405,539.15 is VACATED, and the matter is REMANDED to the trial court to recalculate the amount of the refund due to Appellants after including portions of the *Authority Constructed Facilities (1984-1998)* to the total cost basis of the water distribution system, consistent with this Opinion.

Jurisdiction is relinquished.

_____
ANNE E. COVEY, Judge